# Skadden, Arps, Slate, Meagher & Flom LLP

ONE MANHATTAN WEST
NEW YORK, NY 10001
———
TEL: (212) 735-3000
FAX: (212) 735-2000
www.skadden.com

FIRM/AFFILIATE OFFICES
———
BOSTON
CHICAGO
HOUSTON
LOS ANGELES
PALO ALTO
WASHINGTON, D.C.
WILMINGTON
———
ABU DHABI
BEIJING
BRUSSELS
FRANKFURT
HONG KONG
LONDON
MUNICH
PARIS
SÃO PAULO
SEOUL
SINGAPORE
TOKYO
TORONTO

DIRECT DIAL
(212) 735-2100
DIRECT FAX
(917) 777-2100
EMAIL ADDRESS
David.Meister@Skadden.com

July 17, 2025

*Via ECF*

Honorable Jeannette A. Vargas
United States District Judge
Southern District of New York
500 Pearl Street, Room 703
New York, New York 10007

      RE:    <u>United States v. Cheuk Fung Richard Ho</u>, 1:25-cr-00003-JAV

Dear Judge Vargas:

On behalf of Richard Ho, we respectfully submit this motion for an order directing the Government to comply with its obligations under *Brady v. Maryland*, 373 U.S. 83 (1963), and its progeny, in light of recent developments that suggest that the Government is falling short in this regard, and amidst a fundamental disagreement between the parties concerning *Brady*.

As discussed below, in sifting through the more than 1.3 million documents produced in discovery thus far,[1] the defense has located evidence that seriously calls into question the veracity of a provocative and material allegation in the Indictment: that "after [Mr. Ho's former employer, Headlands] confronted [him] about his founding of [his own firm, One R Squared]," Mr. Ho "instructed one of his employees [Engineer-1] to delete private text messages." Indict. ¶ 22, Dkt. No. 3 (Jan. 6, 2025).[2]

---

[1] The Government has yet to complete discovery. The outstanding items include data extracted from devices that were seized from Mr. Ho's residence and processed into a usable format (following earlier production of that data in largely unprocessed form), and approximately 20 terabytes of data that the Government obtained from Amazon and Microsoft (which the Government has said it will produce shortly). Additionally, we understand that the Government is in the process of redesignating and reproducing over 200,000 electronic communications that had been designated as Proprietary Material, to address the defense's concerns about broad over-designation.

[2] Out of respect for Engineer-1's privacy, we are keeping his identity nonpublic and using the pseudonym given to him by the Government in the Indictment.

Hon. Jeannette A. Vargas
July 17, 2025
Page 2

The evidence we identified is Engineer-1's prior sworn testimony—given privately to counsel for Headlands—that he had doubts about whether Mr. Ho instructed him to delete text messages after being confronted by Headlands (if at all). We see this prior testimony as *Brady* material that the Government should have flagged to the defense and presented to the grand jury before seeking an indictment. *Accord United States v. Herberman*, 583 F.2d 222, 229 (5th Cir. 1978) (where undisclosed grand jury testimony "directly contradicted the testimony of appellant's former employees" on an allegation, "[i]t is difficult to understand how the prosecution could have concluded that the grand jury testimony contained no material which could have cast a reasonable doubt").

After we found this evidence, we brought it to the Government's attention, noting that simply producing it as part of the mass of discovery was insufficient, and that the Government's failure to call it out gave us concerns that the Government was not meeting its *Brady* obligations and had not presented it to the grand jury. The Government responded that it did not consider the information to be *Brady* material, making the remarkable characterization (in our view, at least) that the prior testimony was "consistent" with the Indictment's allegation that the Headlands confrontation prompted Mr. Ho to instruct Engineer-1 to delete private texts.

Guided by this Court's individual rule that "[d]efense counsel may facilitate the Government's compliance with its *Brady* obligations by making specific requests that the Government seek out, review, and/or produce certain evidence or information that defense counsel reasonably believes may contain, or is reasonably likely to lead to the discovery of, *Brady* material," Indiv. Crim. R. 3(A)(ii), we then asked that the Government promptly:

- produce all available information relating to the relevant allegation;

- identify to the defense all known *Brady* and *Giglio* material from among the voluminous discovery produced and yet to be produced, because *Brady* in these circumstances requires the Government to bring such material to our attention, not merely produce it; and

- confirm whether it had undertaken a review of all materials in its possession, custody, or control for *Brady* and *Giglio* material, as is its obligation.

The Government replied that "*Brady* and *Giglio* require nothing further" and maintained that the testimony is "not exculpatory." The Government then provided an excerpt of an FBI Form 302 memorandum of a Government interview of Engineer-1, conducted ten months after the testimony in question, where he made statements that the Government seems to suggest should cure our concerns. They do not. For the reasons set forth below, we are now seeking the Court's intervention.

Hon. Jeannette A. Vargas
July 17, 2025
Page 3

**I. Background**

This case is about whether Mr. Ho stole from Headlands algorithmic trading code that meets the statutory definition of a "trade secret," with the intent to convert a trade secret to his own benefit, and knowing or intending that this would injure Headlands. As we have noted, this relatively rare criminal charge closely tracks the allegations in a civil case brought by Headlands against Mr. Ho two years ago.

Headlands is a "quantitative trading company" that "develops and implements quantitative trading strategies in exchange-traded financial products."[3] Mr. Ho is a Cambridge-educated computer scientist with a long history of writing code to trade financial products on exchanges around the world. When Mr. Ho went to work for Headlands in 2019, he had been writing algorithmic trading code for years, for three different companies up to that point, including a company he owned. Headlands hired Mr. Ho to continue in the same vein, seeking to profit from his years of experience.

At Headlands, Mr. Ho met and befriended Engineer-1, who was also adept at writing code. Engineer-1 left Headlands in 2021, before Mr. Ho did. Engineer-1 later came to work for Mr. Ho at his company, One R Squared ("ORS"). Both Engineer-1 and Mr. Ho wrote algorithmic trading code at ORS, along with several other coders.

In 2023, Headlands threatened Mr. Ho and Engineer-1 with civil litigation for, among other things, violating their employment agreements by competing against Headlands.[4] On June 12, 2023, Headlands brought suit against Mr. Ho, ORS, and Engineer-1 in Illinois state court. Engineer-1 resigned from ORS shortly thereafter.

On July 10, 2023, Headlands informed the Illinois court that it had reached a settlement with Engineer-1, on undisclosed terms. On July 14, Headlands filed a stipulation of dismissal with prejudice as to Engineer-1.[5]

   A. *The Allegation Regarding Deletion of Text Messages*

The Indictment alleges that "[i]n approximately the spring of 2023," "after" Headlands "confronted [Mr. Ho] about his founding of [ORS]," Mr. Ho "instructed one of his employees [Engineer-1] to delete private text messages." Indict. ¶ 22.[6]

---

[3] *See* headlandstech.com.

[4] As Headlands has admitted, *see* Dkt. No. 27, at *4 (Apr. 1, 2025), it is the subject of an ongoing National Labor Relations Board investigation for requiring its employees to sign overly restrictive employment agreements.

[5] Stip. of Dismissal with Prejudice of Def. [Engineer-1], *Headlands Tech Org. v. Ho*, No. 2023-CH-05586 (Ill. Cir. Ct. Cook. Cty. filed July 14, 2023).

[6] The allegation refers to "one of his employees," but the Government has confirmed to us that the ORS employee in question is Engineer-1. We do not know why the Government did not use the

The allegation that Headlands' threat prompted Mr. Ho to give an instruction to delete texts is critical to the Government's case, not only because it inflames the theft charge and attacks Mr. Ho's character, but chiefly because the Government will contend that it proves state of mind. The requisite state of mind for criminal theft of trade secrets (i.e., specific intent to convert a trade secret to one's own or another's economic benefit, knowing or intending that this will injure the owner of the trade secret) is a high hurdle for the Government to prove beyond a reasonable doubt—which is perhaps why theft-of-trade-secrets cases are far more often handled by private plaintiffs in civil suits. The Government's theory, presumably presented to the grand jury, is that Mr. Ho's purported instruction to Engineer-1, coming "after" Headlands had "confronted" him in "the spring of 2023," shows consciousness of guilt and criminal intent, key parts of the Government's case.

B. *Engineer-1's Exculpatory Testimony*

Among the more than 1.3 million documents produced by the Government to date, we came across a transcript of exculpatory testimony of Engineer-1, given under oath and taken privately by Headlands' counsel in an unusual voluntary session on July 7, 2023. In attendance were Engineer-1 (who was then a defendant in the civil case), his counsel, Headlands' counsel, and multiple Headlands executives, including the company's founders. Mr. Ho and ORS were not notified of the interview; no one attended on their behalf, and the transcript was not produced to them in the civil case. Engineer-1's sworn testimony included the following excerpts:

> Q (by Headlands' counsel): *"... when's the first time you remember Headlands Technologies raising questions about One R Squared?"*
>
> A (Engineer-1): *"I think it was either—it was the beginning of 2023 when Richard mentioned that he had received a letter from Headlands talking about noncompete compliance—sorry, are you asking about One R Squared in general or me?"*
>
> Q: *"No, no. That's—I'd like to—since you mentioned that letter and Richard telling you about it, just wondering, you know, what reaction he had to it."*
>
> A: *"**I think he didn't seem too concerned.** I mean, he did hire a lawyer, I think, at that point. He also started talking about ways in which, you know, we should, quote, protect ourselves. Presumably against Headlands or, you*

---

pseudonym Engineer-1 in this paragraph of the Indictment. The paragraph also alleges that after the Headlands confrontation, Mr. Ho "directed his employees to change the retention settings for [ORS]'s internal messages so that they automatically deleted after a certain period of time" and "requested that his employees delete the source code history for [ORS]'s Source Code, which would have shown, among other things, changes that had been made to [ORS]'s Source Code against prior versions of that Source Code, and when those changes had been made." Indict. ¶ 22.

Hon. Jeannette A. Vargas
July 17, 2025
Page 5

> know, maybe cybersecurity to task things like that. He mentioned cybersecurity, as well."[7]
>
> …
>
> Q: *"... And then did he make any other suggestions for proactive measures to protect yourselves with respect to preserving data, for example, with e-mail or any WhatsApp chats?"*
>
> A: *"Oh, so with WhatsApp—okay. I don't remember this timeline because—yeah, **this is something I'm really unsure of because I definitely deleted my WhatsApp history with Richard at some point. I think it was some point in January. What I don't know is if that was just—like, I don't know if that's related to Richard's discussion because I—I really can't remember if he told me to delete it or not. So I think I might have just done it kind of, you know, randomly, I guess.**"*
>
> Q: *"You deleted your WhatsApp history in January of this year?"*
>
> A: *"I think so. With Richard."*
>
> Q: *"With Richard?"*
>
> A: *"Yeah. As in my WhatsApp chat history, like the one-on-one conversations with Richard."*
>
> Q: *"Okay. And what prompted you to do that?"*
>
> A: *"**I actually—I don't know. I think I might have just been going through and cleaning up some things.**"*[8]
>
> …
>
> Q (by Engineer-1's counsel): *"Are you sure that this—you did this before there was any inkling that Headlands was asking questions?"*
>
> A: *"Well—so **this is what I'm not sure of because it depends on when**. So I think it's possible that it was in response to Richard's conversation with me."*
>
> Q (Engineer-1's counsel): *"Okay."*

---

[7] USAO_01838155, Tr. 126:18–127:11. Emphasis (bold) added here and below.

[8] *Id.*, Tr. 130:22–131:22.

Hon. Jeannette A. Vargas
July 17, 2025
Page 6

> A: *"And him—like, I think that he—okay. **So the thing is I think that he told me to delete the WhatsApp history with him. The thing I—that makes me not too sure of it is I was looking through my WhatsApp history with him and then I saw that—an iMessage from early January, and I think that's before I knew about any of this. So that's what makes me question, like, is that actually correct**."*[9]
>
> …
>
> Q: *"Does talking about these discussions with Richard refresh your recollection at all as to whether or not he had actually instructed or suggested to you that you delete your WhatsApp history?"*
>
> A: *"**Again, I mean, it's the same response as before. So I can't remember—like, do you know what date the letter was sent to Richard, like, the very first one?**"*
>
> Q: *"Yeah. So let me just—you said you didn't see the letter, but I'll represent to you that it was February 9th, 2023, that he received—that the letter was sent to Richard from Headlands Technologies raising many of the same questions and concerns expressed in the letter that you received on March 1st, 2023."*
>
> A: *"So I think he told me there were two letters. So there was one, it was a more general one, and then there was a second one. So—"*
>
> Q: *"We haven't gotten to—yes, there is another letter that was sent in April 2023."*
>
> A: *"Oh, no, I'm sorry. **I mean in January 2023 was there a letter** to—"*
>
> Q (Engineer-1's counsel): *"Can I just interrupt here. My impression is that you're not—tell me if this is right. Your recollection is that the request to delete information followed some kind of contact by Headlands. That's your recollection. **But you've seen these earlier WhatsApp messages which causes you to maybe doubt that recollection?**"*
>
> A: *"**Yeah, exactly.**"*
>
> Q (Engineer-1's counsel): *"Okay. I think that's the best we're going to get."*[10]

---

[9] *Id.*, Tr. 132:24–133:16.

[10] *Id.*, Tr. 141:19–143:4.

Hon. Jeannette A. Vargas
July 17, 2025
Page 7

The transcript plainly shows that Engineer-1 was uncertain whether the Headlands confrontation had prompted Mr. Ho to instruct him to delete text messages, and even whether Mr. Ho had ever given such an instruction.

Engineer-1 gave this live sworn testimony on a Friday. On the following Monday—the same day that Headlands reported its settlement with him to the state court—he signed a declaration (in support of a motion by Headlands) in which he claimed that he "recall[ed] that Ho requested that I delete my WhatsApp communication history with him sometime in early 2023."[11] The publicly filed declaration omitted to mention his specific, privately disclosed doubts about these events, including as to whether Mr. Ho's request had been prompted by the Headlands confrontation.

The Government did not flag the testimony transcript for the defense in any manner.

C. *Our Requests of the Government*

By letter to the Government dated February 26, 2025, we requested, among other things, all *Brady* and *Giglio* material.[12] To date, the Government has claimed that it does not possess any *Brady* material at all.

Despite the Government's insistence that there is no *Brady* material, we discovered the Engineer-1 testimony transcript in the mountain of discovery that has been turned over to us thus far and brought our concerns to the Government's attention. We explained that we had discovered the transcript and asked whether the employee referenced in paragraph 22 of the Indictment was Engineer-1, because if so, his sworn statements undercut the allegation, which would suggest that the Government is not meeting its *Brady* obligations. We also noted that Department of Justice policy would have required the Government to disclose Engineer-1's exculpatory testimony to the grand jury.[13]

After initially declining to disclose the referenced employee's identity, the Government confirmed "as a courtesy" that it was Engineer-1 but contended that his testimony is "consistent" with the allegation and "not exculpatory." The Government indicated that it (somehow) found support for the allegation in his testimony by carving it up in a way that isolated the words "he told me to delete the WhatsApp history with him" while ignoring the balance, including the testimony that undercuts

---

[11]   [Engineer-1] Decl. ¶ 25, No. 2023-CH-05586 (Ill. Cir. Ct. Cook. Cty. filed July 10, 2023).

[12]   Our February 26 request also sought, in part, all Government agreements and communications with witnesses, but the Government has declined thus far to provide such information, so we do not have any information as to Engineer-1's status vis-à-vis the Government.

[13]   *See* Justice Manual § 9-11.233.

Hon. Jeannette A. Vargas
July 17, 2025
Page 8

the critical notion that Headlands' threat prompted the alleged instruction. The Government further claimed that "[t]o the extent that it can be considered impeachment material, the Government is not obligated to turn over such material as part of Rule 16 before a trial date has even been set." The Government did not address whether it had disclosed Engineer-1's testimony to the grand jury before asking it to return an indictment.

Recognizing that we have a fundamental disagreement about the nature and scope of the Government's obligations, we again asked the Government to promptly produce all *Brady* and *Giglio* material, and we specifically asked that the Government include any exculpatory information that it may deem to be impeaching but which, like the transcript excerpted above, bears favorably for the defense on any key allegation in the Indictment. We also requested prompt production of all information relating to the allegation that Mr. Ho instructed Engineer-1 to delete private text messages, including any other statements touching on the allegation. Lastly, we asked the Government to confirm whether it had undertaken a review of all materials in its possession, custody, or control for *Brady* and *Giglio* material, as is its obligation.

The Government responded that it "has complied, and will continue to comply, with its obligations under *Brady* [] and *Giglio*," disclaiming the view that it may hold off on disclosing *Brady* and *Giglio* material until after a trial date is set, but maintaining that Engineer-1's prior testimony "is not exculpatory" and is "at best … impeachment material," such that it "was not obligated to turn [it] over" at this stage. The Government asserted that "*Brady* and *Giglio* require nothing further" but provided "as a courtesy" an excerpt of an FBI agent's Form 302 memorandum of a Government interview of Engineer-1, conducted ten months after the transcribed testimony. The 302 excerpt includes: *"[Engineer-1] was told by HO to delete personal messages, … He did delete Whatsapp messages from HO but he was not sure why. He must have deleted them in January 2023 because the first message showing available was from that date. He also deleted messages from [another employee, Engineer-2] because everybody was super paranoid at that time."*

The 302 excerpt does not render the testimony transcript non-*Brady* and does not address our concerns. Rather, it fuels them. The 302 corroborates that Engineer-1 does not know why he deleted texts. It does not even touch on the fact that he testified that he was not sure whether his deletion and the purported instruction had anything to do with Headlands.[14]

---

[14] The defense is of course prepared to provide the Court with the full transcript of Engineer-1's testimony, his declaration three days later, the Government's excerpt of the 302, and any other materials, should the Court direct us to do so.

Hon. Jeannette A. Vargas
July 17, 2025
Page 9

**II. Argument**

As the Court ordered pursuant to Fed. R. Crim. P. 5(f), *Brady* and its progeny require the Government to "disclose to the defense all information 'favorable to an accused' that is 'material either to guilt or to punishment' and that is known to the Government," "regardless of whether the Government credits it"—and the Government "shall disclose such information to the defense promptly after its existence becomes known to the Government so that the defense may make effective use of the information in the preparation of its case." Dkt. No. 9, at *1–2 (Jan. 29, 2025).

This constitutionally grounded disclosure obligation goes hand in hand with the Government's "*Brady* search obligation" as to "materials within prosecutors' possession, custody or control." *United States v. Collins*, 409 F. Supp. 3d 228, 239 (S.D.N.Y. 2019) (Broderick, J.); *see also United States v. Jones*, 620 F. Supp. 2d 163, 183 (D. Mass. 2009) (a prosecutor's "duties under *Brady* and *Giglio*" include the "duty to review her notes and those of law enforcement agents for material exculpatory information").

Engineer-1's sworn testimony that he is uncertain whether Mr. Ho instructed him to delete text messages *after* the Headlands confrontation—and that he has reason to doubt that sequence of events based on data available to him—tends to exculpate Mr. Ho on a key allegation in the Indictment. Even assuming solely for the sake of argument that Mr. Ho asked Engineer-1 to delete anything, if he did so *before* the Headlands confrontation, then the allegation in the Indictment is rendered false. Engineer-1 swore under repeated questioning, even by his own lawyer, that he did not have a reliable recollection of the sequence of events and had specific (and otherwise undisclosed) cause to doubt that the Headlands confrontation came first. *Accord United States v. Herberman*, 583 F.2d 222, 229 (5th Cir. 1978) (where undisclosed grand jury testimony "directly contradicted the testimony of appellant's former employees" on an allegation, "[i]t is difficult to understand how the prosecution could have concluded that the grand jury testimony contained no material which could have cast a reasonable doubt"). His declaration a few days later and the portion of the 302 some ten months later do not cure the failure of proof.

Against the backdrop of an indictment that accuses Mr. Ho of issuing a deletion instruction after being confronted by Headlands, the Government's insistence that the testimony is "not exculpatory" is, at a minimum, troubling, as it reflects a view of the Government's obligations that is inconsistent with the Constitution, the federal criminal rules, and this Court's order and individual rules. Accordingly, given these circumstances, to ensure that the Government complies with its *Brady* obligations, we respectfully request that the Court order the Government to:

1. *Produce all information relating to the allegation that Mr. Ho "instructed one of his employees to delete private text messages," including any other*

Hon. Jeannette A. Vargas
July 17, 2025
Page 10

    *statements touching on the allegation.* The Government's position on the testimony transcript causes us to question its judgment as to what may constitute information favorable to the accused with respect to this allegation in particular. For that reason, and given Engineer-1's testimony, we believe that the information we are seeking "may contain, or is reasonably likely to lead to the discovery of, *Brady* material." Indiv. Crim. R. 3(A)(ii).

2. *Conduct a* Brady *review of the materials in its possession, custody, or control, with the recalibrated understanding that Engineer-1's testimony is likely favorable to the accused within the meaning of* Brady *and its progeny.* We respectfully submit that if the Government does not recognize information that is favorable to the accused when it sees it (regardless of whether the Government credits it), it cannot reliably discharge its *Brady* search and disclosure obligations.

3. *Flag for the defense all known* Brady *and* Giglio *material from among the voluminous discovery already produced and yet to be produced.* The Government has asserted that "even if" Engineer-1's testimony was *Brady* material, it "discharged its disclosure obligations through its production of the transcript"—but in a case like this, where the discovery is vast and comprehensive review is challenging, *Brady* requires the Government not only to produce such material, but also to identify it to the defense. *See, e.g.*, *United States v. Saffarinia*, 424 F. Supp. 3d 46, 85–86 (D.D.C. 2020) ("the government's *Brady* obligations require it to identify any known *Brady* material … in its production of approximately 3.5 million pages of documents"); *United States v. Hsia*, 24 F. Supp. 2d 14, 29–30 (D.D.C. 1998) ("The government cannot meet its *Brady* obligations by providing … 600,000 documents and then claiming that [the defendant] should have been able to find the exculpatory information in the haystack. To the extent that the government knows of any documents or statements that constitute *Brady* material, it must identify that material…."); *cf. United States v. Thomas*, 981 F. Supp. 2d 229, 239 (S.D.N.Y. 2013) (Pauley, J.) ("[T]he Government cannot hide *Brady* material as an exculpatory needle in a haystack of discovery materials.") (citing, *inter alia*, *Hsia*, 24 F. Supp. 2d at 29–30).[15]

---

[15] *See also St. Germain v. United States*, 2004 WL 1171403, at *14 (S.D.N.Y. 2004) (McMahon, J.) ("[T]he Government's statement … that it '… is under no obligation to label [*Brady*] material [as] *Brady* as opposed to 3500 material' … is at best legally incorrect….") (citations omitted); *United States v. Sheppard*, 2022 WL 17978837, at *14 (D.D.C. Dec. 28, 2022) ("'to the extent that the government knows of any [*Brady*] material in its production,' the Court will 'require [the government] to identify' it" from among the "'terabytes of discovery'") (quoting *Saffarinia*, 424 F. Supp. 3d at 86, and citing *Hsia*, 24 F. Supp. 2d at 29); *United States v. Omidi*, 2021 WL 7629896, at *2 (C.D. Cal. Sept. 1, 2021) (ordering the Government to specifically identify *Brady* material to the defense given "simply the sheer volume of discovery"); *United States v. Cutting*, 2017 WL 132403, at *10 (N.D. Cal. Jan. 12, 2017) (ordering the Government "to identify by Bates number

Hon. Jeannette A. Vargas
July 17, 2025
Page 11

>We submit that the Government should be required to identify such material "promptly after its existence becomes known to the Government so that the defense may make effective use of the information in the preparation of its case." Dkt. No. 9, at *1–2.

Separately, we request that the Court order the Government to disclose whether it brought the testimony at issue to the attention of the grand jury that returned the Indictment, because if it failed to do so, there may be grounds for relief with respect to the grand jury process.[16]

### III. Conclusion

For the reasons above, we urge the Court to hold the Government to its *Brady* obligations and grant the above-requested relief.

>Respectfully submitted,
>
>/s/ David Meister
>David Meister
>Daniel Merzel
>SKADDEN, ARPS, SLATE, MEAGHER & FLOM LLP
>One Manhattan West
>New York, NY 10001
>(212) 735-2100
>
>*Attorneys for Cheuk Fung Richard Ho*

---

the *Brady/Giglio* material in the [more than 3.3 million pages of] discovery that has been produced"); *United States v. Blankenship*, 2015 WL 3687864, at *6 (S.D. W. Va. June 12, 2015) ("The Court finds that the United States should specifically designate any known *Brady* material as such and disclose the same to defense counsel. In other words, without more, the United States does not comply with the requirement of *Brady* by merely including all known *Brady* material within the four million plus pages of discovery.").

[16] We note that the Government obtained multiple search warrants by means of affidavits containing the same allegation as appears in paragraph 22 of the Indictment, without disclosing Engineer-1's exculpatory testimony to the courts that reviewed the warrant applications. As a result, we are considering seeking relief with respect to those searches as part of our pretrial motions.