orrick

**Orrick, Herrington & Sutcliffe LLP**
2100 Pennsylvania Avenue, N.W.
Washington, DC 20037

+1 202 339 8400

**orrick.com**

**David McGill**

**E** dmcgill@orrick.com
**D** +1 202 339 8666
**F** +1 202 339 8500

August 25, 2026

**VIA ECF AND EMAIL**

The Honorable Jeannette A. Vargas
United States District Court
Southern District of New York
40 Foley Square
New York, New York 10007

Re: *United States v. Cheuk Fung Richard Ho*, No. 1:25-cr-00003-JAV

Dear Judge Vargas:

We write on behalf of Nonparty-1—referred to as "Firm-1" in the Superseding Indictment—the alleged victim of the trade secret theft charged in the above-referenced criminal proceeding. Pursuant to the Court's Order dated August 21, 2026 (Dkt. No. 167), Nonparty-1 respectfully submits the Declaration of Isaac Pape (the "Pape Declaration"), attached hereto as Exhibit A (filed under seal, per the Court's instructions), in support of the Government's Motion to Close the Courtroom for Portions of the Upcoming *Daubert* Hearing and Trial (Dkt. No. 151).

*The Pape Declaration*

The August 21 Order directed that, among other things, any declaration submitted by Nonparty-1 in support of the Government's Motion "should specify the precise contours of the proprietary information at issue." *Id.* Because it is not a party to this action, Nonparty-1 does not have access to an unredacted version of the Government's June 8, 2026, Bill of Particulars, which was filed under seal.[1] Accordingly, Nonparty-1 relied on the Government's recent Reply in Support of Closing the Courtroom for Portions of Upcoming Proceedings (Dkt. No. 168) to define the parameters of the Pape Declaration. In that submission, the Government explained:

> The trade secrets at issue at this trial include (1) portions of Firm-1's trading source code, both individually and in combination, (2) Firm-1's atom infrastructure, and (3) the use of a combination of concepts in the formulation of Firm-1's fitting algorithm (including specific concepts identified in the Bill of Particulars). Discussion of

[1] Nor does Nonparty-1 have access to the corrected version of the Bill of Particulars filed on June 12, 2026, nor exhibit lists exchanged by the Parties on July 31, 2026, and August 17, 2026. *See* Order Approving Joint Proposed Schedule, Dkt. No. 113.

> these in court would include evidence of, among other things: (1) Firm-1's atom infrastructure and the way it is optimized, (2) full files of specific Firm-1 atoms, which are the building blocks of many of the Firm-1's predictive elements, and (3) Firm-1's unique fitting algorithm.

*See* Dkt. No. 168 at 4–5 (Aug. 21, 2026).

Guided by these, the Pape Declaration describes the precise contours of each category of information above and explains how the public disclosure of trade secrets within each of these categories would cause Nonparty-1 competitive harm.[2] Consistent with the Pape Declaration and the Court's prior decisions addressing Mr. Ho's prior applications to unseal trade secret material, the Court should continue to protect the confidentiality of Nonparty-1's trade secrets at the upcoming proceedings by adopting the closure procedures proposed by the Government. *See* Op. & Order, Dkt. No. 126 at 5 (June 29, 2026); Op. & Order, Dkt. No. 130 at 2 (July 1, 2026).[3]

*No Reasonable Alternatives to Closure Exist*

Pursuant to the August 21 Order, Nonparty-1 also respectfully submits that the Defendant's proffered alternatives to closure are insufficient to protect Nonparty-1's trade secrets at trial.

First, Defendant proposes to turn off public facing monitors and/or to strategically place demonstratives. *See* Def.'s Opp'n to the Gov't's Mot. to Close the Courtroom, Dkt. No. 166 at 9 (Aug. 18, 2026). That is insufficient. As the Government's Reply explains, its proposal "asks to close the courtroom when *testimony* would reveal trade secrets." Dkt. No. 168 at 13 (emphasis in original). Mere "efforts to keep the public from viewing certain exhibits would not mitigate the damage that the testimony could cause Firm-1." *Id.* Such testimony will undoubtedly be necessary. The source code files at issue are written in various computer languages—including C++ , Python, and Java—meaning they are not readily decipherable to lay persons lacking relevant technical

---

[2] Although the Pape Declaration addresses specific source code files to reinforce the necessity of closing the courtroom, given that Nonparty-1 does not have full visibility into the complete list of trade secrets that the Government has placed at issue for trial, the Pape Declaration is not intended to be exhaustive. Accordingly, the omission of any specific file from the Pape Declaration should not be construed as confirming or implying that such file is not a trade secret. To the extent that the Court deems it necessary for Nonparty-1 to provide a declaration addressing each trade secret alleged in the Bill of Particulars, Nonparty-1 respectfully requests that the Court authorize the Government to disclose an unredacted copy of the Bill of Particulars (and any corrected Bill of Particulars) to Nonparty-1, so that it may provide a supplemental declaration as appropriate.

[3] Given the Government's allegation that Defendant used Nonparty-1's trade secrets for use in his own quantitative trading firm (*see* Superseding Indictment, Dkt. No. 103 ¶¶ 2, 7, 14, 21–23, 28 (May 18, 2026)), Nonparty-1 assumes that the Government's proposed protocol applies equally to the trade secrets as repackaged by Defendant for his use.

expertise. Absent contemporaneous testimony "translating" the files, displaying visual source code files would not suffice to educate the average juror on what the proprietary source code is designed to do and how it provides value to Nonparty-1's trading.

Second, Defendant's proposal to instruct witnesses not to read source code files aloud, *see* Dkt. No. 166 at 9, reflects a fundamental misunderstanding of Nonparty-1's trade secrets. Reciting code line by line is not the only way in which testimony could reveal the substance of trade secrets. For example, any testimony in open court that addresses the details of Nonparty-1's source code framework or reveals the specific functions, insights, or parameters embedded in the source code would disclose key components of the trade secrets and allow a knowledgeable competitor to reconstruct functional equivalents—without access to verbatim source code. *See* Pape Decl. ¶¶ 32–34.

Third, Mr. Ho's proposal relating to selective exclusion of competitors' employees, *see* Dkt. No. 166 at 9, is unworkable in practice and insufficient to protect Nonparty-1's trade secrets. Mr. Ho does not propose any mechanism by which the Court could determine the employment status of any member of the public who attends trial on any given day. Nor does he explain which individuals or firms would be considered competitors for purposes of exclusion. Even if these administrative hurdles could be overcome, Mr. Ho's proposal is insufficient, insofar as it wrongly presupposes, among other things, that a competitor could only learn about the trade secrets via firsthand observation of the trial. In reality, all that is necessary is for a single member of the public (or media) to learn about the trade secrets and then share that knowledge with others, including current or future competitors that would be heavily incentivized to obtain it. Among other deficiencies, the proposal would not prevent a member of the public—for example, a student that aspires to join a trading firm or an experienced trader seeking employment—from learning about Nonparty-1's trade secrets at trial and later becoming employed by or acting as a consultant for a competitor. It is precisely this set of concerns that prompted the Court to require Mr. Ho's proposed expert to agree to various restrictive covenants, including noncompete obligations, as a precondition to learning about Nonparty-1's trade secrets. *See* Order, Dkt. No. 87 at 3 (Feb. 12, 2026) (permitting Defendant to retain expert provided he signs Non-Disclosure Agreement prohibiting him from "working as a consultant to any 'competitor to Company-1' . . . with respect to their research and/or development of low-latency, high-frequency automated trading strategies, from today's date through December 31, 2027"). Yet, Mr. Ho's proposal simply ignores the competitive risk that would arise from disclosure of trade secret information to any spectators with a professional or financial motive to exploit that knowledge for their own benefit.

Fourth, Defendant's suggestion that confidentiality agreements could provide an adequate substitute for courtroom closure (*see* Dkt. No. 166 at 9), is particularly ironic. As a condition of his employment with Nonparty-1, Defendant was required to sign numerous agreements restricting his use of Nonparty-1's confidential information and to annually attest that he understood these obligations and restrictions. *See* Superseding Indictment, Dkt. No. 103 ¶¶ 11–13. These written confidentiality agreements were insufficient to prevent his theft. Yet, the Defense now suggests that Nonparty-1 should be comfortable entrusting its trade secrets to any unvetted members of the public willing to execute a confidentiality agreement to gain access to the courtroom. Congress

envisioned far more protective measures when it codified the need to "preserve the confidentiality of [victims'] trade secrets" in prosecutions like this one (18 U.S.C. § 1835(a)), lest victims face the Hobson's choice of cooperating with the Government or protecting their trade secrets.

For all these reasons and those set forth in the Pape Declaration, Nonparty-1 respectfully requests that the Court grant the Government's Motion to Close the Courtroom for Portions of the Upcoming *Daubert* Hearing and Trial (Dkt. No. 151).

Sincerely,

*/s/ David McGill*
David H. McGill

cc: Counsel of record