UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF NEW YORK

| | | |
|---|---|---|
| UNITED STATES OF AMERICA<br><br>-v-<br><br>CHEUK FUNG RICHARD HO,<br><br>Defendant. | : | 25-CR-00003 (JAV)<br><br><u>OPINION AND ORDER</u> |

JEANNETTE A. VARGAS, United States District Judge:

The Government has moved in limine to close the courtroom for portions of the upcoming *Daubert* hearings and the trial scheduled to commence on September 13, 2026. ECF No. 151 ("Gov't Mem."). Defendant Cheuk Fung Richard Ho (the "Defendant") opposes the motion. ECF No. 166 ("Def. Opp'n"). The Court has also received an objection to the contemplated court closure from a member of the press. ECF No. 152 ("Lee Opp'n" or "Press Opposition"). For the reasons that follow, the Court will authorize limited closure of the courtroom during the *Daubert* hearings and trial, as set forth further herein.

**BACKGROUND**

On May 18, 2026, a grand jury returned a superseding indictment against Cheuk Fung Richard Ho (the "Defendant"), charging him with one count of theft and attempted theft of trade secrets in violation of the Economic Espionage Act ("EEA"), 18 U.S.C. §§ 1832(a)(1)-(4) and 2, and one count of wire fraud, in violation of 18 U.S.C. §§ 1343 and 2. ECF No. 103 ("Indictment" or "Ind."), ¶ 28, 30.

The Indictment charges that, from in or about July 2019 to in or about August 2021, the Defendant worked as a research developer and quantitative trader at a global quantitative trading firm ("Firm-1"), which trades in equities and other securities on exchanges based on the execution of computer code. Ind., ¶ 1. Quantitative trading firms compete based on the quality of their research and technology, which are embodied in the computer code that they use to execute automated trading decisions. *Id.*, ¶¶ 6, 7.

The Indictment sets forth how Firm-1 spent years and over a billion dollars developing its Source Code, *id.*, ¶ 8, which is the foundation of Firm-1's competitive advantage in the market, *id.*, ¶ 10. The building block of Firm-1's Source Code is its library of "Atoms," which is code that has specific functions, ranging from computational functions to price-predicting computations. *Id.*, ¶ 9. Each Atom is given a name, which is often unique. *Id.* Combinations of Atoms are used to build Alphas, which are formulas that make price predictions based on real-time market data. *Id.*

Firm-1 has taken a number of measures to protect the confidentiality of its Source Code, *id.*, ¶ 10, including requiring Defendant to sign a Non-Compete Agreement, *id.*, ¶ 12. By executing the Non-Compete Agreement, Defendant "expressly acknowledge[d] the vital importance of Confidential Information in the business of [Firm-1] and agree[d] that all Confidential Information provided to [the Defendant] and developed by [the Defendant] is the sole and exclusive property of [Firm-1], is provided to and held by [the Defendant] in trust; [Firm-1] makes

reasonable efforts to keep it confidential; and it has value to [Firm-I]." *Id.*, ¶ 12(b). The Non-Compete Agreement defined "Confidential Information" to include, among other things, information that Firm-1 "deems to be proprietary" or "that is not generally disclosed" or "generally known" to the public, such as, among other things, "trading strategies," "research," "computer programs," "methods," "processes," "proprietary trading systems and models," "algorithms," and "trade secrets." *Id.*, ¶ 12(a).

In July 2021, the Defendant resigned from Firm-1. *Id.*, ¶ 19. Two months prior to resigning, the Defendant had incorporated his own quantitative trading firm ("Firm-2"), *id.*, ¶ 15. The Indictment alleges that, in order to develop source code for his new firm, the Defendant copied components of Firm-1's Source Code. *Id.*, ¶ 22. The Indictment defines this misappropriated code as the "Stolen Trade Secrets." *Id.* The Indictment describes the "Stolen Trade Secrets" as "portions of Firm-1's Source Code (including Firm-1's Atoms and Alphas), which were predominately written in the C++ and Java programming languages, and which [the Defendant] translated into the C++ and Python coding languages while preserving the structure, logic, trading insights, and functionality of Firm-1's Source Code." *Id.*

The Indictment further alleges that, while still employed at Firm-1, the Defendant began discussions with another firm ("Firm-3"), whereby the Defendant would operate a trading team using its capital, resources, and infrastructure. *Id.*, ¶ 14. "Firm-3 ultimately agreed to purchase a minority ownership stake in Firm-2, to

pay certain of Firm-2's expenses, including compensation for Firm-2's employees, and to provide Firm-2 with access to trading capital and certain of Firm-3's trading infrastructure and other resources." *Id.* The defendant and Firm-3 executed three separate agreements governing the ownership and operation of Firm 2. *Id.,* ¶ 16. As part of these agreements, Firm-2 granted Firm-3 an exclusive license to use Firm-2's proprietary algorithmic trading software, including its source code. *Id.,* ¶ 17(b).

## DISCUSSION

The Sixth Amendment provides that "the accused shall enjoy the right to a . . . public trial." U.S. Const. amend. VI; *see also Presley v. Georgia*, 558 U.S. 209, 213 (2010). Additionally, "the First Amendment . . . has consistently been read to provide the public and press a right of access to criminal trials." *United States v. Smith*, 426 F.3d 567, 574-75 (2d Cir. 2005). These rights are not unqualified, however. *See, e.g.*, *id.* at 571; *United States v. Mial*, 21 Cr. 499 (PAE), 2022 WL 5240988, at *2 (S.D.N.Y. Oct. 6, 2022) (citing *Bowden v. Keane*, 237 F.3d 125, 129 (2d Cir. 2001)). As the Supreme Court has explained, "the right to an open trial may give way in certain cases to other rights or interests, such as the defendant's right to a fair trial or the Government's interest in inhibiting disclosure of sensitive information." *Waller v. Georgia*, 467 U.S. 39, 45 (1984).

"Under *Waller,* a courtroom closure does not rise to the level of a [Constitutional] violation if: (1) closing the hearing would advance an overriding interest that is likely to be prejudiced; (2) the closure is no broader than necessary

to protect that interest; (3) the trial court considers reasonable alternatives to closing the proceeding; and (4) the trial court makes findings adequate to support the closure." *Smith*, 426 F.3d at 571; *see also Waller*, 467 U.S. at 48-49. "[This] test applies whether a closure motion is made by the government over the defendant's Sixth Amendment objection or made by the defendant over the First Amendment objection of the government or press." *United States v. Doe*, 63 F.3d 121, 128 (2d Cir. 1995); *accord Smith*, 426 F.3d at 575.

The Court finds that, under the *Waller* test, closure of the courtroom while witnesses are testifying as to (1) the Source Code files (specifically lines of code or specific details regarding the architecture of the code or how the code functions), (2) Firm-1's Atom infrastructure, including the names of the Atoms, and the way Atoms are optimized; and (3) Firm-1's fitting algorithm (collectively, the "Confidential Information") is no broader than necessary to protect the overriding interest in the protection of the victim's trade secrets. As discussed below, the Court has considered reasonable alternatives to courtroom closure and has found them insufficient.

**A. Overriding Interests**

The Government has identified two overriding interests in play at both the *Daubert* hearing and at trial: the protection of a crime victim's trade secrets and the effective prosecution of theft of trade secrets cases generally. Gov't Mem. at 9. In criminalizing the theft of trade secrets with the passage of the Economic Espionage Act of 1996 (the "EEA"), Congress sought to adopt "a national scheme to

protect U.S. proprietary economic information" in order to maintain the country's "industrial and economic edge and thus safeguard our national security." S. Rep. 104-359, 11-12, 1996 WL 497065 (1996).

Exposing trade secrets to the general public at trial would be contrary to the public interest embodied in the EEA. By definition, a trade secret constitutes information that "derives independent economic value, actual or potential, from not being generally known to, and not being readily ascertainable through proper means by, another person who can obtain economic value from the disclosure or use of the information." 18 U.S.C. § 1839(3)(B). In other words, such information is valuable precisely because it is kept confidential from potential competitors.

As part of the EEA, Congress codified special precautions designed to protect victims' trade secrets. Specifically, the EEA instructs that trial courts "shall enter such orders and take other action as may be necessary and appropriate to preserve the confidentiality of trade secrets, consistent with the requirements of the Federal Rules of Criminal and Civil Procedure, the Federal Rules of Evidence, and all other applicable laws." 18 U.S.C. § 1835. Section 1835 "represent[s] a clear indication from Congress that trade secrets are to be protected to the fullest extent during EEA litigation." *United States v. Hsu*, 155 F.3d 189, 197 (3d Cir. 1998). The purpose of this provision is to "encourage[] enforcement actions by protecting owners who might otherwise 'be reluctant to cooperate in prosecutions for fear of further exposing their trade secrets to public view, thus further devaluing or even

destroying their worth.'" *Id.* at 197 (quoting House Report 104-788 at 13 (Sept. 16, 1996)).

Accordingly, the Court concludes that protection of trade secrets and the interest of the Government in encouraging victims of theft of trade secrets to report such crimes are overriding interests that justify courtroom closure. *See United States v. Zhang*, 590 F. App'x 663, 667 (9th Cir. 2014) (affirming closure of courtroom during criminal prosecution where witness testified regarding trade secrets); *United States v. Aleynikov*, No. 10 CR 96 DLC, 2010 WL 5158125, at *1 (S.D.N.Y. Dec. 14, 2010) (authorizing closure of courtroom during criminal trial during "detailed testimony revealing the trade secrets of the victim"); *cf. Richmond Newspapers, Inc. v. Virginia,* 448 U.S. 555, 600 n.5 (1980) (Stewart, *J.*, concurring) (observing in *dicta*, even prior to the enactment of the EEA, that preservation of trade secrets might serve as justification for courtroom closures); *Stamicarbon, N.V. v. Am. Cyanamid Co.*, 506 F.2d 532, 540 (2d Cir. 1974) (in pre-*Waller* case, holding that protection of trade secrets could justify limited closure of criminal contempt trial).

**B. Breadth of Closure**

"[A] courtroom closure is permissible [under the second *Waller* prong] so long as there is a positive and proportional relationship between (1) the extent of the closure, and (2) the 'gravity' of the interest that assertedly justifies the closure, discounted by the probability of the interest being harmed if the courtroom is not closed." *Bowden v. Keane,* 237 F.3d 125, 129 (2d Cir.2001). "Whether a closure is

narrow or broad depends on several factors, including its duration, whether the public can learn what transpired while the trial was closed (e.g. through transcripts), whether the evidence was essential, and whether selected members of the public were barred from the courtroom, or whether all spectators were excluded." *Carson v. Fischer*, 421 F.3d 83, 89-90 (2d Cir. 2005).

Defendant argues that the risk of harm here is minimal, as the contemplated witness testimony would concern "only a tiny fraction of [Firm-1's] source code, and only code as it existed in mid-2021." Def. Opp'n at 7. Defendant points out that the "limited code snippets at issue here did not cost [Firm-1] 'more than a billion dollars to develop,'" *id.*, as that was the cost to develop the entirety of Firm-1's Source Code. Defendant asserts that there "is no basis to conclude that testimony about these five-year-old code snippets in open court . . . would be likely to 'jeopardize' or have any effect whatsoever on the value of [Firm-1's] present-day source code." *Id.* In a similar vein, the Press Objection asserts that only "verbatim recitation" of the Source Code merits protection, while testimony that "merely discusses, at a functional or comparative level, what the code does" can be provided in open court. ECF No. 152 at 2.

The Court has, in accordance with 18 U.S.C. § 1835(b), provided Firm-1 with the opportunity to submit a declaration under seal to specify the contours of its proprietary information, the competitive harms that would result from disclosure in open court of such information, and why lesser alternatives than court closure would not be sufficient to protect this information. ECF No. 167. Firm-1 provided a

declaration from the individual who oversees all software development for its trading operations. ECF No. 173, Ex. A ("Sealed Declaration"). The Court is satisfied that the Sealed Declaration explains, with the requisite degree of specificity, the substantial competitive and economic harm that Firm-1 could suffer from public disclosure of confidential proprietary information regarding its Source Code, as the Source Code is the foundation of the company's automated trading strategies. *Id.* In particular, the Sealed Declaration makes clear that the disclosure of even an individual component of the Source Code could allow a competitor to glean substantial insights into Firm-1's strategic decisionmaking, while details regarding how the Atom infrastructure operates, what a particular Atom code file contains, or how a fitting algorithm works could enable a knowledgeable competitor to reconstruct functional equivalents. *Id.*, ¶ 32. This is true even of code that is five-years old, as much of that code is still in use with only minor modifications, and the basic architecture of the code, and the relationship between the components, would reveal current trading strategies. *Id.*, ¶ 34. The potential harm to Firm-1 from public disclosure of this information is therefore substantial, permanent and irreparable.

The Court weighs the gravity of this interest against the critical nature of the evidence to the criminal prosecution and the breadth of the closure. The evidence in question does not relate to a tangential issue, but is of central relevance to the criminal charges, including whether the information at issue constitutes a trade secret and whether the Defendant plagiarized Firm-1's Source Code. The Court

must therefore minimize the extent of courtroom closure to ensure that both the Defendant's Sixth Amendment rights and the public right of access are preserved to the greatest degree possible.

The duration of any such closures must be appropriately limited. Counsel must first avail themselves of methods to examine witnesses that does not result in oral testimony regarding Confidential Information. Counsel, for example, may conduct witness examinations with reference to sealed exhibits or demonstratives containing the Confidential Information that are published solely to the jury. This will minimize the extent that oral testimony that reveals the Confidential Information will be elicited.

Based upon the expert disclosures that have been produced in this case and the nature of the charges, however, the Court finds that these procedures will not entirely eliminate the need for oral testimony delving into, at a high level of detail, the specifics of the Confidential Information, particularly during cross-examination by the Defendant. The Court will therefore permit closure of the courtroom, but only when oral testimony needs to be elicited regarding the Confidential Information and these other procedures prove insufficient.

The breadth of the closure will be as narrowly tailored as reasonably possible under the circumstances. Most members of the public will be excluded during the contemplated court closure, including representatives from Firm-3, one of the alleged victims in this case. The Court, however, will permit representatives from Firm-1 and its counsel to remain present during these closed sessions. The Court

will also entertain an application from the Defendant to have family members or other specified individuals present in the courtroom during this testimony, should one be made.

The breadth of the closure will be further limited by the public release of any portions of the transcripts from closed sessions that does not reveal Confidential Information. The parties shall review transcripts of the closed court sessions, and inform the Court within one week of the conclusion of the hearing or trial of any non-proprietary information in the sealed portions of the transcript that can be unsealed and made available to the public.

**C. Reasonable Alternatives to Closure**

The Court has also considered reasonable alternatives to closure of the courtroom and concludes that none would suffice to protect Firm-1's trade secrets. The Defendant proposes that exhibits or demonstratives containing Confidential Information be placed under seal and excluded from public view, and Government witnesses can be instructed not to read aloud lines of code. Def. Opp'n at 9. Yet the Court already intends to do just that in order to minimize the extent of courtroom closure. The courtroom will be closed only when oral testimony needs to be solicited regarding the Confidential Information, and reference to an exhibit or demonstrative in lieu of such testimony is not feasible.

The Defendant also points to language in *Stamicarbon* to suggest that the "attending public can be put under oath—or required to sign confidentiality agreements on pain of contempt—to keep confidential" the trade secrets at issue.

Def. Opp'n at 9. As an initial matter, the Second Circuit did not endorse such an approach for the general public. Rather, it raised the possibility of accommodating specific witnesses that the Defendant wished to have present in this manner. *Stamicarbon*, 506 F.2d at 541. The practical issues of binding members of the public to a confidentiality agreement or enforcing such an agreement are obvious. The Court would be in no position to determine if a violation has occurred, or if so, who had violated it. Moreover, non-disclosure agreements are imperfect mechanisms to protect highly valuable and lucrative trade secrets. The potential incentives for revealing that information would be powerful, while the risk of harm to Firm-1 from disclosure of its Confidential Information to a competitor would be permanent and irreparable.

Alternatively, Defendant requests that the Court order the exclusion only of representatives of competitors of Firm-1. Such screening would be impossible to implement as a practical matter. The Court is in no position to know who all of the various competitors of Firm-1 might be, let alone their employees and representatives.

Finally, the Press Objector proposes that the Court permit an audio stream to an overflow courtroom with a delay mechanism. Because closure of the courtroom will be limited to periods where oral testimony will be given regarding the Confidential Information, an audio stream does not provide a reasonable mechanism to protect Confidential Information.

## CONCLUSION

The Court has balanced the Defendant's Sixth Amendment right to a public trial, the public and press's interest in access to the proceedings, and the overriding interest of the alleged victim in preventing irreparable and permanent harm to Firm-1's business by the exposure of trade secrets that lie at the heart of its business model. The Court concludes that, based upon its detailed factual findings set forth herein, limited courtroom closure is appropriate.

The Clerk of Court is directed to terminate ECF No. 151.

SO ORDERED.

Dated: September 1, 2026
New York, New York

JEANNETTE A. VARGAS
United States District Judge