SKADDEN, ARPS, SLATE, MEAGHER & FLOM LLP
ONE MANHATTAN WEST
NEW YORK, NY 10001

TEL: (212) 735-3000
FAX: (212) 735-2000
www.skadden.com

FIRM/AFFILIATE OFFICES
BOSTON
CHICAGO
HOUSTON
LOS ANGELES
PALO ALTO
WASHINGTON, D.C.
WILMINGTON
ABU DHABI
BEIJING
BRUSSELS
FRANKFURT
HONG KONG
LONDON
MUNICH
PARIS
SÃO PAULO
SEOUL
SINGAPORE
TOKYO
TORONTO

DIRECT DIAL
(212) 735-2100
DIRECT FAX
(917) 777-2100
EMAIL ADDRESS
DAVID.MEISTER@SKADDEN.COM

September 10, 2026

*Via ECF*

The Honorable Jeannette A. Vargas
United States District Judge
Southern District of New York
500 Pearl Street
New York, NY 10007

RE: *United States v. Ho*, 25 Cr. 3 (JAV)

Dear Judge Vargas:

On behalf of Richard Ho, we respectfully submit this letter in opposition to the Government's latest attempt to preclude the testimony of the defense's expert witness, Prof. Mark Hendricks, in its entirety, *see* Dkt. No. 198 ("Mot.").[1] The Court already denied this "drastic remedy" at Tuesday's conference, after repeatedly confirming the "incredible prejudice" that would flow from preclusion of the defense's sole proposed expert. Tr. 345, 348, 372 (Sept. 8, 2026). Yet instead of focusing on the narrow question on which the Court instructed the parties each to file a single letter-brief—i.e., "the issue pertaining to the bases for [Prof. Hendricks's] opinions about other firms," and "whether or not there are other Rule 16 issues," Tr. 348, 374—the Government uses its brief to move again for preclusion of Prof. Hendricks's entire testimony pursuant to Rule 702, Rule 403, and Rule 16.

Respectfully, the Government has lost sight of what expertise means, what the rules require, and what they do not require. The Court should continue to decline to follow the Government down the dangerous path of holding Prof. Hendricks to a standard that has no basis in criminal law and practice—a false standard that the Government's own expert disclosures fail to meet, and a road to obvious prejudicial error.

[1] Depending on how one counts, this is the Government's fifth or sixth push to keep the jury from hearing from the sole potential defense expert. The Government asked for the same relief by motion on May 7, August 25, and September 8, 2026, and in court on July 21 and repeatedly on September 8 (following the Court's denial of the relief).

The Government's motion fails for at least three reasons:

*First*, the Government misstates the law by looking to civil cases applying a civil rule that has no application here. Fed. R. Civ. P. 26 and Fed. R. Crim. P. 16 set forth different requirements for expert disclosures. The civil cases that the Government cites, including the *Rail Freight* case, all hinge on language in the civil rule that does not exist in the criminal rule, i.e., "the facts or data considered by the witness in forming [the opinions]." Fed. R. Civ. P. 26(a)(2)(B)(ii). Rule 16 is narrower, and the narrower rule means narrower expert discovery. By relying on authority that invokes the plainly wrong standard—while also not bringing that fundamental distinction to the Court's attention—the Government pushes the Court to reach the wrong decision based on the wrong law.

*Second*, the Government misstates Prof. Hendricks's opinion when it contends that he should be required to tie each one of his opinions to a specific firm whose code he has seen, and explain which "component" (i.e., which lines) of code he has seen at which firm. The premise for that contention is false because that is not his opinion and it was never set forth that way. It is *not* Prof. Hendricks's opinion that any particular lines of code at Headlands match particular lines of code he has seen at a particular firm elsewhere. Rather, he will explain what the Headlands code files do—i.e., the logic, trading insights, and functionality of the files and their components—and how he knows that the files are not novel, based on his years of experience teaching these concepts, writing and editing code, advising students, consulting with firms, and devoting his entire career to the relevant field. This is his area of expertise, and experts routinely testify based on their expertise without needing to pick out singular experiences from their careers to link to their opinions. In that context, the hyper-specificity that the Government demands makes no sense and is at odds with the very concept of experiential expert testimony.

*Third*, our expert disclosures, together with Prof. Hendricks's testimony as to his qualifications and methodology at the *Daubert* hearing, are more than sufficient to clear the hurdles of *Daubert* and Rule 16. The Government's own expert disclosures prove the point. Somehow, for its own experts, the Government is content to point to their knowledge and experience as bases for their opinions, without any attempt to conduct the tying exercise that the Government deems legally necessary. But when it comes to Prof. Hendricks, despite our detailed, 24-page, single-spaced, file-by-file disclosure addressing well over a hundred enumerated items of code, what each piece of code does, and on what basis Prof. Hendricks concludes that none of it is novel—the Government insists that this is not enough. The question is why not, when every supposed deficiency or source of unreliability that the Government highlights in our supplemental disclosure is equally true (if not more so) of its own disclosures. At bottom, the Government's complaints go to weight, not admissibility. And the proper channel for that is cross-examination, not preclusion or further supplementation.

For all these reasons, as discussed below, we respectfully request that the Court deny the motion.[2]

**A. Rule 16 Does Not Require Disclosure of All "Facts or Data Considered," Yet the Civil Cases Cited by the Government All Hinge on This Language**

This is not the first time that the Government has asked the Court to act based on a serious misapplication of authority. *See, e.g.*, Dkt. No. 76, at 15 (contending that the court in *Latimore* "denied the defendant's motion to dismiss," when the decision did not even concern a motion to dismiss); Dkt. No. 101, at 26 (lopping off part of the statutory definition of a trade secret when discussing that element); Dkt. No. 195, at 3 (citing multiple civil cases in a discussion of Rule 704(b), which applies solely to criminal cases). Here again, the Government is wrong on the law. We bring up this point not to resurrect history, but because it shows that the Government either is willing to press the Court to make critical decisions on the basis of plainly inapposite authority or has not reviewed the caselaw on which it relies.

The Government cites three cases—*Rail Freight*, *Brainchild*, and *Mirena IUD*—for the premise that "district courts have routinely prevented an expert from hiding the bases for an opinion behind a shroud of confidentiality." Mot. at 11; *see also* Dkt. No. 196, at 2–3 (Sept. 8, 2026) (same). But what the Government fails to mention is that all three cases are civil cases that hinge on the requirement in Fed. R. Civ. P. 26 that an expert disclosure contain not only "a complete statement of all opinions the witness will express and the basis and reasons for them," but *also* "the facts or data considered by the witness in forming them." Fed. R. Civ. P. 26(a)(2)(B)(i)–(ii). Rule 16, by contrast, contains only the first requirement, not the second. *Compare* Fed. R. Crim. P. 16(b)(1)(C)(iii).

The three civil cases do not support the Government's interpretation of Rule 16 because their discussion of "bases" subsumes the separate, civil-only requirement that a party disclose all "facts or data considered" by the expert. *See In re Rail Freight Surcharge Antitrust Litig.*, Misc. No. 07-0489 (PLF/JMF), 2013 WL 12384733, at *2, 7 (D.D.C. Nov. 12, 2013) (out-of-circuit magistrate judge decision ordering disclosure of details of "hundreds of contracts" referenced by the expert in his report, because those contract negotiations were "facts or data considered" by the expert under Rule 26); *Brainchild Surgical Devices, LLC v. CPA Glob. Ltd.*, 144 F.4th 238, 256 (4th Cir. 2025) (Rule 26 "addresses this very point," requiring disclosure of "basis and reasons" as well as "the facts or data considered by the witness" (citation omitted)); *In re Mirena IUD Prods. Liab. Litig.*, 169 F. Supp. 3d 396, 470 (S.D.N.Y. 2016) (precluding testimony of industry expert who had served as an FDA regulatory reviewer for the medical product at issue, because

[2] The Government has not asked for further pretrial testimony in its brief, and we submit that none is required. Nonetheless, to the extent the Court decides to hold an additional *Daubert* hearing, we respectfully request reasonable advance notice so that we can arrange a date with Prof. Hendricks, given his university commitments in Chicago.

she could not speak to the "facts or data [she] considered" in connection with that confidential review, contrary to Rule 26, where the word "considered" expansively covers "anything received, reviewed, read, or authored by the expert, before or in connection with the forming of his opinion, if the subject matter relates to the facts or opinions expressed" (citation omitted)).[3] As this Court is well aware, there is no such requirement in a criminal case.[4]

### B. An Expert Is Not Required to Tie His Opinions to Singular Experiences That Form Part of His Accumulated Knowledge

The Government demands to "know not only where Hendricks has *consulted*, but where, when, and how he has seen the components of [Headlands] code files 'at other firms.'" Mot. at 12. But the Government's premise—that Prof. Hendricks knows where he has seen a particular component of a Headlands code file at a particular firm—is false. He is not able to provide such precision, nor is there any requirement that he do so. If the Government wishes to probe the lack of a specific connection to a particular firm and file component on cross-examination, that is the Government's choice, but it has no bearing on the reliability of Prof. Hendricks's analysis under Rule 702 (nor on the sufficiency of our disclosure under Rule 16).

Indeed, "[i]n certain fields, experience is the predominant, if not sole, basis for a great deal of reliable expert testimony." Fed. R. Evid. 702, Adv. Comm. Notes on 2000 Amend. For example, when a doctor testifies based on years of clinical experience in a particular specialty, no court would precondition the testimony on tying each opinion to a particular patient, a particular procedure, or the like. *Accord Mirena IUD*, 169 F. Supp. 3d at 415, 419–21 (permitting doctors to testify about "secondary perforation" based on years of experience as practicing OB/GYNs, placement of "hundreds of IUDs," and "familiarity and experience in placing and teaching how to place IUDs"); *see also Bellew*

---

[3] Moreover, these three civil cases all involved experts who had some sort of personal involvement with the facts of the case: an expert who had been part of contract negotiations with the defendants (*Rail Freight*), an expert who had worked for the defendant company and was opining on its practices in comparison to his current employer's practices (*Brainchild*), and an expert who had been involved in the FDA's regulatory review of the very product at issue (*Mirena IUD*). Here, by contrast, Prof. Hendricks is not relating his opinions to any particularized experiences with any one firm, let alone Headlands or One R Squared. He is merely opining that the information in the code files is not novel, based on his substantial experience. This is what the Government's experts have done, and that is sufficient under Rule 16.

[4] The Government separately cites two criminal cases in a footnote, which it acknowledges are outside of the Rule 16 context, Mot. at 11 n.4, and which are indeed inapposite. Both concern a defendant or co-conspirator invoking the Fifth Amendment during cross-examination after testifying on direct. *See United States v. Frank*, 520 F.2d 1287, 1292 (2d Cir. 1975) (district court struck testimony of co-conspirator who refused to respond to questions on cross that would have revealed his perjury during direct); *United States v. Baker*, 166 F. App'x 566, 568 (2d Cir. 2006) (district court declined to strike defendant's direct testimony after defendant refused to answer questions on cross relating to matters discussed during his direct, and court instead instructed the jury).

*v. Ethicon, Inc.*, No. 13 Civ. 22473, 2014 WL 12685965, at *19 (S.D. W. Va. Nov. 20, 2014) (expert's reliance on "clinical experience … can hardly be described as a 'mystery,'" and "[i]f *Daubert* required an expert witness to independently verify every single clinical experience he had over the course of his career, the court would never make it past pre-trial motions").

Likewise, when a law enforcement officer with years of narcotics investigation experience testifies about why the presence of certain drug paraphernalia is consistent with distribution, no court would precondition the testimony on tying each opinion to a specific past encounter with drug paraphernalia, what exactly he saw, when, and where. *Accord United States v. Lopez*, 547 F.3d 364, 373 (2d Cir. 2008) ("The district court qualified Ralat as an expert precisely on the basis of the 'knowledge, skill, [and] experience' accumulated during his seventeen years as a NYPD detective … Ralat made it clear that his opinions were not only based on 'what people tell me,' but rather also on 'what I have seen over years and years of being involved in investigating narcotics.' … There was no error in qualifying Ralat as an expert under Rule 702." (cleaned up)); *see also United States v. Campbell*, 851 F. App'x 370, 377–78 (4th Cir. 2021) ("It is true that Agent Briggs did not point to a specific experience to inform each opinion, but we have never required this for experiential expert opinions," and his "years of investigatory experience and exposure to thousands of gang and drug conversations … does not lend itself to a direct correlation between one experience and opinion." (cleaned up)); *United States v. Diaz*, No. 22-4277, 2023 WL 6366689, at *2 (4th Cir. Sept. 29, 2023) ("Detective Garcia formed his opinions [on MS-13] based on his experience, which is a sufficiently reliable methodology. … And even though Detective Garcia did not connect each opinion to specific experiences, that in itself 'is unsurprising' and did not undermine the basis of his testimony." (citation omitted)).

So, too, with Prof. Hendricks. He has worked in the field of quantitative finance for over a decade, both in academia and as a consultant in the industry. He sets curriculum for a program that teaches many of the building blocks that are alleged to be trade secrets in this case. He himself teaches them. Yes, his experience with firms in the industry is a central part of his accumulated knowledge, but his testimony will draw on that experience in the same way it draws on the rest of his experience. The precondition the Government seeks to impose has no basis in the law.

The Government accuses us of proposing an unlawful solution to accommodate its desire to get information that extends beyond what the law requires. We disagree. There is nothing lawless about the compromise we propose, which would avoid the Government launching a fishing expedition into the professor's relationships with firms. There is no more basis to investigate the details of every firm he has ever worked with than there is to investigate every training or seminar he has led, every discussion he has had, every code file he has written, or every syllabus he has reviewed. It is hard to imagine what credible purpose could be served by this other than harassing a university professor, damaging his

livelihood, and applying pressure on him (and the university)—tactics that could very well result in an upstanding professor having to walk away.

### C. Our Supplemental Disclosure and *Daubert* Showing Are More Than Sufficient, and the Government's Hypocrisy "Leaps Off the Page" (Dkt. No. 196, at 1)

The Government argues that our 24-page supplemental disclosure, which addresses, item by item, the 40 pairings of 54 Headlands source code files and One R Squared files and the 78 Headlands atoms—across 118 enumerated items setting forth Prof. Hendricks's opinions on what each and every specified Headlands code file does and how he knows that these items are in no way novel—is still not enough. The baffling thing is that the Government's own disclosures are rife with the supposed deficiencies that it is now complaining about.

The Government claims, page after page, that it is "left to guess" at any and all manner of things, Mot. at 8–10, but the Court should reject the Government's feigned ignorance. The Government very well knows from our prior disclosures, from the *Daubert* briefing, from the language of the supplemental disclosure, and from Prof. Hendricks's testimony last week that his opinions address the entirety of every file and the entire implementation, not only parts, *id.* at 8–9—just as the Government knows what he means when he addresses similarities and refers to numerical values within a file, *id.* at 9. Nor is it credible when the Government argues that "for 63 of the 78 Atoms, Hendricks says nothing" about how he knows that they are basic. *Id*. The disclosure describes what the atoms do. The descriptions are basic, just as the atoms are basic. One would scarcely think that a mathematics professor at the University of Chicago would need to clarify how he knows that such matters as addition, subtraction, multiplication, and division are known to someone other than Headlands.

A comparison of our supplemental disclosure to the Government's disclosures and to the testimony elicited at the *Daubert* hearings reveals the double standard that the Government is seeking to impose here:

- Many of Prof. Johnson's disclosed opinions say nothing at all about how he arrives at his "incantation … stated nearly verbatim over and over again," Mot. at 10, that the files are "novel and valuable." *See, e.g.*, Johnson Discl. ¶¶ 20–45. He summarizes his experience in general and sweeping language at the top of the disclosure. *Id.* § I ("The statements herein are based on my knowledge, training, skill, academic research, experience with computer coding languages, my review and analysis of materials referenced herein, and the following publications [listing ten books or articles, consisting of well over a thousand pages] … Based on my experience writing code for myself and other businesses, my experience working in the industry, my study of academic literature and scholarship concerning empirical asset prices, the application of

AI and machine learning in finance options, markets, asset management, market microstructure, and financial economics, I know the following: …"). When it comes to the opinions themselves, aside from a few cites to long papers, he does not tie a single opinion to any aspect of that general experience, and there are no citations at all for his opinions concerning code. Many of his opinions simply describe what he believes the code files do, full stop. *See, e.g.*, Johnson Discl. ¶¶ 56–59.

- Ms. Loewenstine's disclosure is even thinner in this respect. She simply summarizes her experience at the top of her disclosure and declares that *all* of her statements "are based on my knowledge, training, skill, and experience, … as well as my review and analysis of materials," without grounding any opinion as to any particular file in any specific aspect of her experience. Loewenstine Discl. §§ I, II.

- The Government complains that Prof. Hendricks cites a textbook and several open-source libraries "without a pincite." Mot. at 7. Ms. Loewenstine cites the entire protobuf.dev website—more than 6,000 pages of printed material—without a hint of what specifically she examined there. Loewenstine Discl. at 5 n.2. Prof. Johnson lists three textbooks and seven academic articles as bases of his opinions with nary a pincite, and without connecting any one of those materials to any of his opinions concerning the individual code files. Johnson Discl. § II.

- Although Ms. Loewenstine did not disclose her review of open-source materials (other than the protobuf.dev website) as a basis for her opinions, she claims that "while versions of" a particular file "are publicly available, I have not seen a publicly available version … that is set up in this way with this specific functionality." Loewenstine Discl. ¶ 22(d). She offers no explanation of what search she conducted or what publicly available materials she reviewed. Nor does she indicate whether her open-source review of materials extended beyond this file.

- Prof. Johnson testified that his "understanding of what is common in the industry" comes from "three sources in general." Hearing Tr. 130 (Sept. 2, 2026). One of those sources consists broadly of "textbooks and written reports and other disclosures from industry professionals." *Id*. Another source is "my own informal conversations over the years with both students and professionals working in the … high-frequency trading industry on what the common practices are and what the trends are in that industry." *Id*. The Government did not provide the list of names of students and professionals who have had informal conversations with Prof. Johnson about their industry work, the names of firms where they work, what they spoke with him about, or when and where

these conversations took place. Nor has the Government provided any detail about the supposed "disclosures from industry professionals" that form a purported basis of Prof. Johnson's opinions.

- Ms. Loewenstine testified that when she worked at the NSA years ago and reviewed the code of colleagues who had completed the same training, she did not observe the same degree of similarity that she observed in comparing the Headlands and One R Squared code snippets. Hearing Tr. 101 (Sept. 2, 2026). That is the sole (somewhat) specific example she gave of when she had previously compared two sets of code and observed their degree of similarity. The Government has not disclosed those colleagues' names, what kind of code they were working on, what the function of the code was, and the nature of the similarities she did observe. The Government of course asserts that all of that information is classified and out of the defense's reach. The Government's flippant suggestion that there is "no prohibition on defense counsel contacting or calling anyone," including the NSA, highlights the hypocrisy of the Government's position. Mot. at 13 n.8.

At a high level, all three experts employed the same general approach as to the set of files now at issue: Like Prof. Johnson, Prof. Hendricks reviewed the Headlands code files. Like Ms. Loewenstine, Prof. Hendricks compared the Headlands code files to the One R Squared code files. Ms. Loewenstine concluded, based on her experience reading and writing code, that the files were intentionally copied. Prof. Johnson concluded, based on his experience in academia and writing his own code, that the files are novel and valuable. Prof. Hendricks concluded, based on his years of academic and industry experience, that there is nothing novel there. Yet the Government contends that only one—the one, we submit, with the *most* experience in this area—is unreliable and unfairly prejudicial, based on a made-up argument that the Government cannot easily "test" his opinions. *Id.* at 12. The comparison shows that this is a false distinction. Prof. Hendricks's "practical experience, paired with [his] careful review of the evidence in this case, meets the reliability prong under Rule 702," and any argument "regarding 'reliability' and 'fit' go[es] to the weight of [his] testimony, rather than to its admissibility." *United States v. Xue*, 597 F. Supp. 3d 759, 769–70 (E.D. Pa. 2022).

* * *

For all the foregoing reasons, we respectfully request the Court deny the Government's motion and permit Prof. Hendricks to testify consistent with his disclosed opinions.

Respectfully submitted,

/s/ David Meister

David Meister
Andrea Griswold
Daniel Merzel
**SKADDEN, ARPS, SLATE, MEAGHER & FLOM LLP**
One Manhattan West
New York, NY 10001
(212) 735-2100

*Counsel for Richard Ho*